Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| FRANCISCO A. ABREU ALDARONDO; ROSA E. ABREU PELLOT; IRENE ABREU SERRA; MARÍA TERESA CRUZ ABREU; WILMA LÓPEZ GONZÁLEZ; CARMEN TERESA MENDOZA RIOLLANO; Y ALICIA MUÑOZ ROMÁN<br><br>Apelantes<br><br>V.<br><br>COLEGIO SAN ANTONIO, INC. Y EL FIDEICOMISO DE PLAN DE PENSIÓN PARA EMPLEADOS DE ESCUELAS CATÓLICAS<br><br>Apelados<br><br>JOSÉ A. PONCE ABREU<br><br>Apelante<br><br>V.<br><br>COLEGIO SAN ANTONIO, INC.<br><br>Apelado | KLAN202400446 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Caso Núm.: A1CI201700317 A1CI201800407<br><br>Sobre: Reclamación Laboral; Salarios; Derechos o Beneficios; (Compensación Diferida) Bajo la Ley 2 del 17 de octubre de 1961 (Procedimiento Sumario) |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 24 de febrero de 2025.

El 6 de mayo de 2024, comparecieron ante este Tribunal de Apelaciones Francisco A. Abreu Aldarondo, Rosa E. Abreu Pellot, Irene Abreu Serra, María Teresa Cruz Abreu, Wilma López González, Carmen Teresa Mendoza Riollano, Alicia Muñoz Román y José A. Ponce Abreu (en conjunto, los apelantes), mediante recurso de *Apelación.* Por medio de este, nos solicitan que, revisemos la

Número Identificador

SEN2025 _____

*Sentencia* emitida el 24 de abril de 2024, notificada al día siguiente, por el Tribunal de Primera Instancia, Sala Superior de Aguadilla. En virtud del aludido dictamen, el foro *a quo* declaró No Ha Lugar la *Querella* instada por las partes apelantes y, consecuentemente, desestimó la misma con perjuicio.

Por los fundamentos que adelante se esbozan, se revoca el dictamen apelado.

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Querella* presentada por Francisco A. Abreu Aldarondo, Rosa E. Abreu Pellot, Irene Abreu Serra, María Teresa Cruz Abreu, Wilma López González, Carmen Teresa Mendoza Riollano, y Alicia Muñoz Román el 4 de mayo de 2017, bajo el procedimiento sumario de reclamaciones laborales, en contra del Colegio San Antonio, Inc. (en adelante, el Colegio) y el Fideicomiso de Plan de Pensión para Empleados de Escuelas Católicas (en adelante, el Fideicomiso).[1] Por medio de esta, alegaron que, habían trabajado durante más de dieciocho (18) años para el Colegio. Sostuvieron que, este último difirió sus salarios para aportarlos al Fideicomiso. Indicaron que, a cambio de ello, el Colegio les proveería un ingreso mensual en forma de pensión a partir de su retiro. Manifestaron que, el Colegio y/o el Fideicomiso suspendieron los pagos, efectivo el 30 de junio de 2016.

Detallaron que, el 14 de marzo de 2016, se les informó sobre la terminación del Fideicomiso mediante un comunicado. Puntualizaron que, la comunicación remitida indicaba que, luego de terminado el Fideicomiso, los activos remanentes se repartirían

---

[1] Apéndice del recurso, págs. 78-184. Hacemos constar que, la *Querella* contra el Fideicomiso fue archivada, tras una solicitud de desistimiento presentada por los apelantes. Asimismo, puntualizamos que, los apelantes no incluyeron documento alguno en su apéndice sobre este asunto. No obstante, hemos tomado conocimiento judicial de ello a través de los dictámenes emitidos por este foro apelativo en los casos KLAN201800642 y KLAN202100054.

entre los pensionados. No obstante, manifestaron que, no habían recibido su pensión ni dinero alguno desde julio de 2016. Simultáneamente, esgrimieron que, el Colegio había retenido ilegalmente la suma de $11,183.58, la cual incrementaba a razón de $1,863.93 mensualmente.

A raíz de todo lo anterior, alegaron que, el Colegio les respondía como patrono por sus derechos o beneficios. Mientras que, el Fideicomiso le respondía al Colegio como su agente para depósito, conservación, administración, inversión y pago de dichos derechos o beneficios. Así pues, solicitaron el pago del dinero adeudado, así como los intereses por mora y una suma por concepto de honorarios de abogado.

El 30 de mayo de 2017, el Colegio instó *Contestación a la Querella*.[2] En esencia, este negó la mayoría de las alegaciones. Afirmó que, los activos del Fideicomiso habían sido producto de aportaciones de los colegios participantes y no de los apelantes. De modo que, el Colegio no había diferido los salarios de sus empleados para realizar las aportaciones al Plan de Pensión. Añadió que, el Colegio no había sido partícipe de la decisión de cerrar el Fideicomiso; y que, como patrono, efectuó la totalidad de las aportaciones hasta la comunicación remitida el 14 de marzo de 2016.

Como defensas afirmativas, indicó que, la escritura constituyente del Fideicomiso fijaba la duración y terminación del mismo. Alegó que, esta también establecía que, los patronos no podían ser demandados por los beneficiarios, puesto que, el Fideicomiso era una entidad separada. Añadió que, los daños reclamados eran exagerados e inexistentes.

---

[2] Apéndice del recurso de apelación, págs. 185-188.

Más adelante, el 9 de agosto de 2017, los apelantes presentaron una *Solicitud de Sentencia Sumaria*.[3] Mediante esta, propusieron veinte (20) hechos incontrovertidos. De otro lado, y a grandes rasgos, insistieron en que, el Colegio tenía que cumplir con su obligación patronal.

Tras varias incidencias procesales innecesarias pormenorizar para atender la controversia ante nuestra consideración, el 2 de enero de 2018, el Colegio instó su *Oposición a Sentencia Sumaria de la Parte Querellante*.[4] A través de esta, alegó que, el Plan de Pensiones no creaba un derecho vitalicio, por lo que no tenía la obligación de continuar con el pago de las pensiones. Detalló que, no existía disposición alguna que creara una expectativa de continuidad en el pago de las pensiones una vez finalizara el Fideicomiso. Ante ello, arguyó que, no existía una controversia fundamental.

En este punto, resulta pertinente señalar que, el 21 de mayo de 2018, el señor José A. Ponce Abreu (en adelante, señor Ponce Abreu) presentó una *Querella* bajo el caso civil núm. H1CI201800407.[5] Por medio de esta, el señor Ponce Abreu esgrimió los mismos argumentos y las mismas causas de acción comprendidas en la *Querella* reseñada en el primer párrafo de esta *Sentencia*. Posteriormente, el 11 de junio de 2018, el Colegio instó *Contestación a Querella*.[6] Atendidos los escritos, el 27 de julio de 2018, el foro primario emitió *Orden*, mediante la cual consolidó el pleito con el caso previamente instado por los apelantes.[7]

Así las cosas, y luego de otros varios trámites procesales, el 29 de julio de 2019, notificada el 5 de agosto de 2019, el Tribunal de Primera Instancia emitió *Sentencia* desestimando la *Querella*

---

[3] *Íd.*, págs. 189-247.
[4] *Íd.*, págs. 399-404.
[5] *Íd.*, págs. 545-548.
[6] *Íd.*, págs. 549-554.
[7] *Íd.*, págs. 555-557.

presentada por los apelantes.[8] En su dictamen, el foro primario consideró probados quince (15) hechos, y razonó que, el Colegio no tenía responsabilidad alguna por el pago de las pensiones a sus empleados ante la insolvencia del Fideicomiso. Precisó que, la escritura constituyente del Fideicomiso establecía categóricamente que este podía terminarse o descontinuarse por razones ajenas a la voluntad del auspiciador del Plan.

De otro lado, concluyó que, el Plan de Pensiones rechazaba la posibilidad de que el Colegio respondiese por los pagos como parte del contrato de empleo. Sobre ello, señaló que, el Artículo 21 del Plan en cuestión establecía que, este no podía ser interpretado como un contrato de empleo entre el patrono participante y los empleados. Añadió también, que, el Plan de Pensiones relevaba al patrono de cualquier responsabilidad directa por los pagos de la pensión.

Insatisfechos, el 15 de agosto de 2019, los apelantes instaron un recurso de apelación ante esta segunda instancia judicial.[9] Tras una revisión *de novo* del expediente del caso, 17 de octubre de 2019, un Panel Hermano emitió y notificó *Sentencia* revocando el dictamen del tribunal de instancia.[10] En resumidas cuentas, el foro apelativo estableció que, subsistían siete (7) controversias sobre hechos esenciales que ameritaban la celebración de una vista evidenciaria. Así pues, el caso fue devuelto al foro primario.

En atención a ello, el tribunal *a quo* celebró vistas los días 16 y 18 de noviembre de 2020. Desfilada la prueba y sometidos los casos, el 4 de enero de 2021, notificada el 13 de enero de 2021, el foro primario emitió *Sentencia* declarando No Ha Lugar la *Querella* y desestimó la misma con perjuicio.[11] En su dictamen, el tribunal

---

[8] *Íd.*, págs. 558-573.
[9] *Íd.*, págs. 574-593.
[10] *Íd.*, págs. 594-607.
[11] *Íd.*, págs. 59-77.

primario consignó sesenta y un (61) determinaciones de hechos, las cuales transcribimos a continuación:

**Determinaciones de hechos según surge de la Sentencia emitida el 17 de octubre de 2019 por el Tribunal de Apelaciones en el caso KLAN201900905**

1. El Colegio San Antonio, Inc., es una corporación educativa secular ubicada en Isabela, Puerto Rico.

2. Para los periodos de tiempo en que los querellantes laboraron para el Colegio San Antonio, éste participó de un Fideicomiso creado por la Arquidiócesis de San Juan para la administración de un plan de pensiones para sus empleados.

3. La escritura de Fideicomiso establecía que el plan de pensión continuaría por el tiempo que fuera necesario para cumplir con el propósito para el cual fue creado, pero que podía terminarse o descontinuarse por razones ajenas a la voluntad del auspiciador del plan.

4. El Plan de Pensión establece que, si los activos disponibles para el pago de las pensiones no son suficientes para cubrir las obligaciones dentro de las prioridades, los fondos disponibles serían prorrateados por el Fideicomiso y distribuidos equitativamente.

5. Específicamente, el Plan de Pensión estableció que éste no se podría interpretar como un contrato de empleo entre el patrono participante y los empleados.

6. ***Específicamente el Plan de Pensión establece que ni las modificaciones al mismo, ni la creación de cualquier fondo o cuenta, ni el pago de cualquier beneficio deberá interpretarse como que crea u otorga a favor de cualquier empleado participante o persona alguna, derecho legal o equitativo en contra del patrono participante o en contra de cualquier oficial del auspiciador y/o fiduciario o en contra del Comité de Retiro.*** (Énfasis en el original.)

7. El Colegio San Antonio era un patrono participante del referido Plan de Pensiones.

8. De acuerdo a los términos del Plan de Pensiones una vez un patrono hubiera ingresado voluntariamente al plan, asumiendo responsabilidades frente al Fideicomiso y no frente a sus empleados particulares, éste no podía retirarse. La única causa de retiro del Fideicomiso era el cierre de la institución o la quiebra económica.

9. Asimismo, el Plan de Pensiones establece que la duración de las obligaciones de los patronos participantes frente al Fideicomiso sería perpetua, pues los empleados adquieren ciertos beneficios frente al Fideicomiso que no pueden ser retirados.

10. Los beneficios a ser pagados por el Fideicomiso ser[í]an pagados de por vida, con una garantía de por lo menos 60 meses.

11. El 14 de marzo de 2016 la Sra. Ana Cortés cursó una comunicación a los pensionados informándoles la decisión de terminar el Plan de Pensiones y explicándoles que los activos restantes en el Plan se repartirían a los pensionados.

12. El 18 de abril de 2016 la Sra. Ana Cortés envió una comunicación al Secretario de Hacienda, notificando la decisión de terminar [el] Plan de Pensiones.

13. El Plan de Pensiones de las Escuelas Católicas de la Arquidiócesis establece lo siguiente:

"Artículo 18 Terminación del Plan:

A. El Auspiciador **se reserva el derecho** de dar por terminado este plan en su totalidad en cualquier momento, por cualquier razón, o sin razón alguna, sujeto previamente a la aprobación del Secretario de Hacienda, y/el Pension Benefit Gurantee Corporation, así como la mayoría de los patronos participante[s.]

B. Esta terminación será efectiva si el comité y el fiduciario reciben un permiso de terminación del Secretario de Hacienda. En tal caso, cada participante entrar[á] en posesión de todos los derechos, títulos e intereses de los beneficios acumulados adquiridos bajo el plan según se estipula en la sección D de este artículo.

C. El fiduciario ejecutar[á] todos y cada uno de los documentos legales necesarios para lograr la terminación del fideicomiso según provee este documento.

D. Cuando la terminación del Plan ha sido aprobada, los fiduciarios del plan procederán a liquidar el fondo de fideicomiso y a proporcionar los activos de acuerdo con las prioridades establecidas por los reglamentos del Título IV de ERISA…["].

**Determinaciones de hecho según surgen de las estipulaciones de las partes contenidas en el informe de conferencia con antelación al juicio presentado el 13 de noviembre de 2020**

14. El Querellante Francisco A. Abreu Aldarondo (en adelante Abreu Aldarondo) trabajó en el Colegio desde el 1964 hasta el 1967 y desde 1969 hasta 2002, fecha en que se retiró.

15. Abreu Aldarondo recibió una pensión de $439.95 mensuales hasta junio 2016.

16. La querellante Rosa E. Abreu Pellot (en adelante "Abreu Pellot") trabajó en el Colegio desde el 1978 hasta el 1999, fecha en que se retiró.

17. Abreu Pellot recibió una pensión de $246.21 mensuales hasta junio de 2016.

18. La querellante Irene Abreu Serra (en adelante "Abreu Serra") trabajó en el Colegio desde el 1978 hasta el 2003, fecha en que se retiró.

19. Abreu Serra recibió una pensión de [$]359.35 mensuales hasta junio de 2016.

20. La querellante María Teresa Cruz Abreu (en adelante "Cruz Abreu") trabajó para el Colegio desde el 1978 hasta el 1999, fecha en que se retiró.

21. Cruz Abreu recibió una pensión de $171.96 mensuales hasta junio de 2016.

22. La querellante Wilma López González (en adelante "López González["]) trabajó para el Colegio desde el 1978 hasta el 1997, fecha en que se retiró.

23. López González recibió una pensión de $160.16 mensuales, hasta junio de 2016.

24. La querellante Carmen Teresa Mendoza Riollano (en adelante "Mendoza Riollano["]) trabajó para el Colegio desde el 1979 hasta el 2004, fecha en que se retiró.

25. Mendoza Riollano recibió una pensión de $264.00 mensuales, hasta junio de 2016.

26. La querellante Alicia Muñoz Román (en adelante "Muñoz Román["]) trabajó para el Colegio desde el 1961 hasta el 1963 y desde el 1983 hasta el 1998, fecha en que se retiró.

27. Muñoz Román recibió una pensión de $22.30 mensuales hasta junio de 2016.

28. El querellante José A. Ponce Abreu (en adelante "Ponce Abreu") trabajó en el Colegio desde el 1970 hasta el 2009.

29. Ponce Abreu recibió una pensión de $603.07 mensuales hasta junio de 2016.

30. El plan de pensiones de las Escuelas Católicas de la Arquidiócesis de San Juan emitió los pagos de pensión a los querellantes hasta junio de 2016.

31. A octubre de 2020 el Colegio no había radicado una petición de quiebras.

32. Al mes de abril de 2020 el Colegio no había cesado operaciones.

.        .        .        .        .        .        .        .

### Determinaciones de hechos a base de la prueba presentada en el juicio celebrado los días 16 y 18 de noviembre de 2020

33. Las partes estipularon en la vista evidenciaria del 16 de noviembre de 2020 que a partir del 30 de junio de 2020 el Colegio cesó sus funciones educativas, lo cual fue anunciado al país en el mes de mayo de 2020. Sin embargo, se estipuló que el Colegio todavía existe como persona jurídica dado que está inscrito como una corporación independiente en el Registro de Corporaciones.

34. Se estipuló en la vista evidenciaria del 16 de noviembre de 2020 que ninguno de los querellantes firmó la escritura de fideicomiso.

### Testimonio del Sr. José Ponce Abreu

35. El Sr. José Ponce Abreu testificó que comenzó a trabajar en el Colegio en el año 1974, cinco años antes de que comenzara el plan de pensiones de la Superintendencia de Escuelas Católicas.

36. El señor Ponce Abreu testificó que durante su periodo de empleo en el Colegio se desempeñó como maestro, director asociado y decano de disciplina.

37. El señor Ponce Abreu fue específico en que, al momento del comienzo de la participación del Colegio en el plan de pensiones de la Superintendencia de Escuelas Católicas en el 1979, era director asociado y la mano derecha de la directora del Colegio.

38. Su testimonio, enfatizó que como parte del grupo gerencial este fue parte de las conversaciones que dieron base a que el Colegio le propusiera a los empleados entrar a formar parte del plan de pensiones de la Superintendencia de Escuelas Católicas.

39. Testificó, además, que durante las conversaciones en cuanto a un posible aumento de compensación a los empleados del Colegio se decidió ofrecer como incentivo una aportación de un equivalente al 4% del salario bruto de los empleados al plan de pensiones de la Superintendencia de Escuelas Católicas.

40. Según testificó el señor Ponce Abreu, este 4% no se le deducía del salario, sino que era una aportación directa del patrono al plan de pensiones.

41. No se le dio credibilidad al testimonio del Sr. José Ponce Abreu en cuanto a que el colegio le haya hecho una representación directa de que los pagos de pensiones serían realizados por el Colegio utilizando sus propios activos. Por el contrario, su testimonio estableció que la propuesta original y la idea para un plan de pensiones a los empleados no surgió en el seno del Colegio sino en la Superintendencia de Escuelas Católicas. Su testimonio estableció que la propuesta para el plan de pensiones surge de una comunicación recibida en el Colegio de parte de la Superintendencia de Escuelas Católicas.

42. De su testimonio surge y no está controvertido, que el incentivo propuesto era la aportación patronal equivalente al 4% del salario bruto de los empleados al plan de pensiones. A nuestro entender, el salto de ese ofrecimiento a la idea de que era el Colegio mismo quien haría los pagos de la pensión es, en el mejor de los casos, una conjetura del querellante sin base alguna en los hechos. Esto es particularmente cierto de un empleado gerencial, quien alega conocer que la idea, información y desarrollo del plan de pensiones provenía de la Superintendencia de Escuelas Católicas y a la misma vez alega que el Colegio le prometió que le haría los pagos de pensión directamente. Las dos posiciones son claramente contradictorias y minan la credibilidad que nos pueda merecer este testimonio en este punto. Mas aún, el señor Ponce Abreu testificó ser la mano derecha de la directora del Colegio y tener acceso a la información de los procedimientos para la otorgación de la aportación patronal, sin embargo, a la misma vez alegó un desconocimiento total de los elementos administrativos del plan de pensiones dado que los mismos se daban en la Superintendencia de Escuelas Católicas. No damos credibilidad a que un empleado gerencial quien conocía que el plan de pensiones ni se inició ni se administraba ni conservaba los fondos apartados en el Colegio, creyera de buena fe, a la misma vez que el Colegio estaba asumiendo una responsabilidad vitalicia por el pago de unas pensiones cuyos fondos ni conservaba ni administraba.

43. Suma a esta conclusión que el señor Ponce Abreu testificó que la razón por la que se estableció el 4% de aportación patronal directa al plan de pensiones de la Superintendencia de Escuelas Católicas fue debido a que esta cantidad era consistente con las finanzas del Colegio. Resulta pues, problemático, que el testigo admita que la aportación de 4% era lo que las finanzas del Colegio podían manejar y a la misma vez alegue, siendo un empleado gerencial,

que se le prometió y que él creyó de buena fe, que esas mismas finanzas podían sostener el pago global de las pensiones para todos los retirados del colegio.

44. A preguntas sobre la posible existencia de prueba documental que hubiera reducido a escrito el alegado acuerdo verbal donde el Colegio se obligó al pago directo de pensiones vitalicias, el señor Ponce Abreu testificó que inicialmente no se firmó nada el día de la reunión donde se aprobó que el Colegio participaría en el plan de pensiones. Sin embargo, admitió que posteriormente la Superintendencia de Escuelas Católicas y no el Colegio le envió un documento sobre los términos del plan de pensiones para que lo firmara. El testimonio estableció, además, que el señor Ponce Abreu tenía dicho documento en su residencia. El documento no fue presentado en evidencia por ninguna de las partes. Lo relevante a los hechos de este caso no es el contenido del documento, el cual no es parte de la prueba, sino el hecho de que según lo testificado por el señor Ponce Abreu dicho documento no provino del Colegio sino de la Superintendencia de Escuelas Católicas.

### Testimonio de la Sra. Wilma López González

45. La Sra. Wilma López González testificó que entró a trabajar como maestra al Colegio en el 1978 con anterioridad a que existiera el mencionado plan de pensiones de la Superintendencia de Escuelas Católicas.

46. Expresó que como parte de procesos de negociación laboral se les ofreció a los empleados del Colegio una aportación patronal a un plan de pensiones de la Superintendencia de Escuelas Católicas equivalente a un 4% del salario bruto del empleado.

47. El testimonio de la señora López González reafirmó que este 4% no representó una deducción al salario que recibían los empleados, sino que era una aportación patronal directa al plan de pensiones de la Superintendencia de Escuelas Católicas.

48. La señora López González testificó que el documento que recibió explicando los pormenores del plan de pensiones no provenía del Colegio sino de la Superintendencia de Escuelas Católicas.

49. La señora López González admitió que no existe ningún documento que establezca una responsabilidad personal del Colegio por los pagos directos de las pensiones más allá de la aportación patronal al plan de pensiones de la Superintendencia de Escuelas Católicas.

50. No se le dio credibilidad a su testimonio en cuanto a que un funcionario del Colegio específicamente le

prometiera que éste se responsabilizaría de los pagos de las pensiones más allá del cumplimiento con la aportación patronal del 4% de su salario bruto al plan de pensiones de la Superintendencia de Escuelas Católicas. Su testimonio no pudo establecer con lenguaje inequívoco que esa promesa o representación de pago se le hiciera en términos específicos. Por el contrario, la idea de que el Colegio era responsable personalmente de los pagos nos parece una conjetura o inferencia de la señora López González que no tiene base en los hechos específicos de este caso.

### Testimonio Sra. Carmen Colón Calderín

51. La Sra. Carmen Colón Calderín testificó ser la jefa de la Sección de Planes de Pensiones perteneciente al área de política contributiva del Departamento de Hacienda.

52. Su testimonio estableció que cuando un plan de pensiones pretende cerrar o liquidarse debe notificar a su división para que ésta notifique el efecto de dicha liquidación sobre los deberes contributivos del plan y sus participantes.

53. El testimonio estableció que dicha notificación no representa una autorización para el cierre del plan ni una adjudicación sobre la procedencia de su liquidación.

54. El Departamento de Hacienda, según el testimonio pericial de la señora Colón Calderín, no adjudica nada sobre la procedencia del cierre o liquidación del plan de pensiones en controversia en este caso.

### Determinaciones de hecho específicas en cuanto a las 7 controversias identificadas por el Tribunal de Apelaciones en su Sentencia del 17 de octubre de 2019 a base de la prueba testifical y documental presentada por las partes en el juicio celebrado los días 16 y 18 de noviembre de 2020.

1. Las aportaciones al Fideicomiso del Plan de Pensión para empleados de Escuelas Católicas son el resultado de aportaciones del patrono. Los testimonios escuchados no alegan que las aportaciones representaran salarios retenidos, ni diferidos.

2. No se pasó prueba con respecto a que existiera justa causa para el cierre del Fideicomiso conforme a la Escritura que lo creó. Es un hecho estipulado que el Colegio no ha radicado procedimiento de quiebra. Se estipuló que el Colegio cesó funciones educativas a junio de 2020. El colegio aún existe como persona jurídica al amparo de la Ley de Corporaciones, aunque no se pasó prueba de que acciones, si alguna realiza. Como cuestión de realidad, no surge de la prueba presentada que el Colegio se haya retirado voluntaria y

unilateralmente del Plan de Pensiones ni ningún otro hecho referente al proceso del cierre del Plan de Pensiones o del Fideicomiso.

3. El Secretario del Departamento de Hacienda del Estado Libre Asociado de Puerto Rico no ha aprobado el cierre del Fideicomiso. Aunque no surge del testimonio de la Sra. Carmen Colón Calder[i]n.

4. No se pasó prueba de que se hubiese cerrado el Fideicomiso conforme a la Escritura que lo creó, ni que se hayan distribuido los activos del Plan de Retiro entre los empleados.

5. No existe prueba para establecer que el Fideicomiso haya cerrado conforme a la Escritura que lo creó. No existe prueba a la que otorgáramos credibilidad para sostener la tesis de que el Colegio en manera alguna se haya obligado en su carácter personal, mediante un acuerdo con / o representación a sus empleados al pago de las pensiones o haya contraído deuda personal alguna por dicho concepto con los empleados.

6. No existe prueba de que el Fideicomiso se haya cerrado conforme a las disposiciones de su escritura por lo cual no podemos concluir que en caso de este tener deuda con los empleados, la misma le haya sido transferida automáticamente al Colegio. En este caso, no existe prueba alguna que se presentara en la vista evidenciaria y a la que este Tribunal concediera credibilidad para sostener la idea de que el Colegio tenía una responsabilidad supletoria por el pago de las pensiones en el caso del cierre del Fideicomiso.

7. Independientemente del Fideicomiso, a entender de este Tribunal, no surge ni del Manual Informativo para patronos participantes ni de ninguna otra prueba documental que haya sido admitida conforme a las Reglas de Evidencia en la referida vista, ningún otro derecho a favor de los beneficiarios ni responsabilidad adicional del patrono que no fuera el pago de las aportaciones conforme a los incisos 6 y 7 de manual. Asumiendo para efectos de la discusión que se alegue que exista alguna deuda por concepto exclusivo de las aportaciones al plan, la prueba presentada no puso al Tribunal en posición de calcular la misma en ausencia de evidencia en cuanto a dicho hecho. Habiéndose sometido el caso por la parte demandante sin haber desfilado dicha prueba, no podemos imponerle responsabilidad alguna al Colegio por dicho concepto.

A tenor con lo anterior, el foro de instancia concluyó que, a base de la prueba presentada, no existía evidencia para sostener que, el Colegio había quedado obligado a satisfacer de manera

directa el pago de las pensiones. Detalló que, el acuerdo entre el Colegio y sus empleados "se reducía a la aportación patronal equivalente al 4% de su sueldo al [P]lan de [P]ensiones…"[12] Añadió que, no hubo evidencia que le mereciera credibilidad para sostener que, los apelantes tenían una expectativa razonable de que el Colegio sería quien le pagaría sus pensiones directamente.

Inconformes, los apelantes acudieron nuevamente ante nos mediante el caso identificado con el alfanumérico KLAN202100054. En dicha ocasión, el recurso fue acogido como un *Certiorari*, y este foro apelativo concluyó que, el foro de instancia había incumplido con el mandato expreso de nuestro Tribunal de Apelaciones. Mediante *Resolución* emitida el 30 de junio de 2022, notificada el 8 de noviembre de 2022, este tribunal intermedio razonó que, subsistían reclamaciones sin atender relacionadas al Fideicomiso.[13] Precisó que, el juez de instancia erróneamente había informado que no atendería las mismas, puesto que, el Fideicomiso no se encontraba en el pleito. Por otro lado, el Panel Hermano puntualizó que, el desistimiento del Fideicomiso había sido sin perjuicio.

En vista de ello, el recurso fue denegado y el caso fue devuelto al Tribunal de Primera Instancia para que este dictara una sentencia completa, de conformidad a la orden previamente emitida.

Así las cosas, el 24 de abril de 2024, notificada al próximo día, el foro de primera instancia emitió la *Sentencia* cuya revisión nos ocupa.[14] En resumidas cuentas, el tribunal primario reprodujo el dictamen emitido previamente, y añadió que, de la prueba presentada no surgía evidencia alguna que permitiera concluir "la naturaleza de la responsabilidad del Fideicomiso por las pensiones en controversia."[15]

---

[12] *Íd.*, pág. 76.
[13] *Íd.*, págs. 46-58.
[14] *Íd.*, págs. 1-19.
[15] *Íd.*, pág. 19.

Consecuentemente, la primera instancia judicial declaró No Ha Lugar la *Querella* "en su totalidad, en cuanto a todas las causas de acción y en cuanto a todas las partes demandadas de epígrafe incluyendo, el Colegio San Antonio y el Fideicomiso del Plan de Pensión para Empleados de Escuelas Católicas y cualquier otra parte en el presente pleito, y la desestima, con perjuicio."[16]

Inconformes aún, el 6 de mayo de 2024, los apelantes acudieron ante nos mediante recurso de *Apelación* y esgrimieron los siguientes señalamientos de error:

PRIMER ERROR: ERRÓ EL TPI Y QUEDÓ MOSTRADA SU PASIÓN, PREJUICIO Y PARCIALIDAD EN CONTRA DE LOS MAESTROS RETIRADOS QUERELLANTES Y APELANTES.

SEGUNDO ERROR: ERRÓ EL TPI AL DICTAR SENTENCIA DESESTIMANDO LAS RECLAMACIONES DE LOS MAESTROS RETIRADOS QUERELLANTES APELANTES.

TERCER ERROR: ERRÓ EL TPI AL LLEGAR A CONCLUSIONES DE HECHOS Y DE DERECHO CONTRARIAS A LAS DETERMINACIONES PREVIAS, LAS ESTIPULACIONES DE PARTE Y PRUEBA PRESENTADA QUE NO FUE CONTROVERTIDA.

Tras varios trámites procesales, el 22 de octubre de 2024, emitimos *Resolución* mediante la cual, le concedimos a la parte apelada hasta el miércoles, 20 de noviembre de 2024, para exponer su posición en torno al recurso. Habiendo transcurrido el término dispuesto sin que esta compareciera, dimos por perfeccionado el recurso y procedemos a disponer del mismo.

## II

### A. Deferencia Judicial

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor

---

[16] *Íd.*

posición para aquilatar la prueba testifical. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

No obstante, **la deferencia judicial no es absoluta**, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, supra, pág. 753; *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, supra, pág. 356.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Véase, además, *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020); *Umpierre Matos v. Juelle Abello*, 203 DPR 254, 275 (2019), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo que, nuestra más Alta Curia ha definido la *discreción* como "una forma de razonabilidad aplicada al discernimiento judicial para

llegar a una conclusión justiciera." *Rivera Gómez v. Arcos Dorados Puerto Rico*, Inc., 2023 TSPR 65, *Pueblo v. Rivera Montalvo*, supra, citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016); *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra; *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997); *Hietel v. PRTC*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, supra.

## B. Teoría General de los Contratos

Es normativa reiterada que, las obligaciones nacen de la ley, de los contratos y cuasicontratos, de los actos ilícitos, u omisiones en que interviene culpa o negligencia, y cualquier otro acto idóneo para producirlas.[17] Art. 1042 del Código Civil, 31 LPRA § 2992[18]; *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021); *NHIC et al. v. García Passalacqua et al.*, 206 DPR 105 (2021). Los contratos son negocios jurídicos bilaterales y en nuestro ordenamiento, constituyen una de las varias formas en que las personas pueden obligarse entre sí. *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000). Los contratos se perfeccionan cuando median el

---

[17] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, puesto que, la causa de acción contra el Colegio fue instada previo a la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

[18] Equivalente al artículo 1063 del Código Civil de 2020, 31 LPRA § 8984.

objeto, consentimiento y causa. Art. 1213 del Código Civil, 31 LPRA § 3391[19]; *Pérez Rodríguez v. López Rodríguez et at.*, 210 DPR 163, 186 (2022). El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA § 3371[20]; *Pérez Rodríguez v. López Rodríguez et at.*, supra; *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263, 284 (2021). Así pues, los contratos son obligatorios, **cualquiera que sea la forma en que se hayan celebrado**, siempre que en ellos concurran las condiciones esenciales para su validez. Artículo 1230, *supra*, 31 LPRA sec. 3451. Por ende, **los contratos verbales tienen tanta eficacia como los escritos**. *Méndez v. Morales*, 142 DPR 26, 34 (1996); *Vila & Hnos., Inc. v. Owens Ill. de P.R.*, 117 DPR 825 (1986).

Una vez perfeccionado el contrato, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". Art. 1210 del Código Civil, 31 LPRA § 3375[21]; *Aponte Valentín v. Pfizer Pharm.*, supra; *Burgos López et al. v. Condado Plaza*, supra, pág. 8. Adicionalmente, en nuestro ordenamiento jurídico se ha reconocido el principio de libertad de contratación, el cual permite a las partes pactar los términos y condiciones que tengan por convenientes. *Pérez Rodríguez v. López Rodríguez et at.*, supra, pág. 187; *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 7-8 (2015); *Arthur Young & Co. v. Vega III*, 136 DPR 157 (1994). No obstante, tal libertad no es infinita, puesto que, encuentra su límite en el Artículo 1207 del Código Civil, 31 LPRA § 3372. El referido artículo dispone que, los términos y condiciones

---

[19] Equivalente al artículo 1237 del Código Civil de 2020, 31 LPRA § 9771.
[20] Equivalente al artículo 1230 del Código Civil de 2020, 31 LPRA § 9751.
[21] Equivalente al artículo 1233 del Código Civil de 2020, 31 LPRA § 9754.

que las partes establezcan serán válidas cuando no sean contrarias a la ley, la moral, ni al orden público. Art. 1207 del Código Civil, *supra*[22]; *Burgos López et al. v. Condado Plaza*, supra; *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014). Una vez perfeccionado el contrato, **lo acordado tiene fuerza de ley entre las partes**, "**y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley**". Art. 1210 del Código Civil, 31 LPRA § 3375[23]; *Aponte Valentín v. Pfizer Pharms.,* supra; *Burgos López et al. v. Condado Plaza*, supra, pág. 8.

Los tribunales estamos facultados para velar por el cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno. *Mercado, Quilichini v. UCPR*, 143 DPR 627 (1997). Asimismo, debemos recordar que, la máxima que rige en nuestro ordenamiento en materia de interpretación de contratos, dispone que, si los términos de un contrato son claros y no existe duda en torno a la intención de los contratantes, debemos ceñirnos al sentido literal de sus cláusulas. Art. 1233 del Código Civil de Puerto Rico, 31 LPRA sec. 3471. No obstante, si las palabras utilizadas en el contrato parecen ser contrarias a la intención evidente de los contratantes, prevalecerá la intención de éstos al pactar. *Íd.* De resultar necesario juzgar esa intención de las partes al contratar, debemos considerar sus actos anteriores, coetáneos y posteriores al contrato, y cualquier otro factor que arroje luz en torno a sus voluntades. Art. 1234 del Código Civil de Puerto Rico, 31 LPRA sec. 3472. *Negrón Vélez v. ACT*, 196 DPR 489 506-507 (2016).

---

[22] Equivalente al artículo 1232 del Código Civil de 2020, 31 LPRA § 9753.
[23] Equivalente al artículo 1233 del Código Civil de 2020, 31 LPRA § 9754.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a aplicarla.

**III**

En su primer señalamiento de error, los apelantes sostienen que, quedó evidenciada la pasión, el prejuicio y la parcialidad del foro primario en su contra, al desposeerlos de cualquier causa de acción contra el Fideicomiso. Ello, en atención a que, el foro recurrido consignó que desestimaba la *Querella* contra el Fideicomiso, con perjuicio. Añaden que, en tanto el Fideicomiso no era parte del pleito, el foro de instancia no tenía jurisdicción sobre este, por lo que la *Sentencia* apelada es nula en ese aspecto.

Tras un examen minucioso del expediente ante nos, razonamos que le asiste la razón.

Conforme surge, el 14 de mayo de 2018, los apelantes presentaron una moción para desistir sin perjuicio de la causa de acción contra el Fideicomiso.[24] Tras la oposición de este, el 4 de junio de 2018, el foro de instancia emitió *Sentencia Parcial* declarando con lugar la solicitud de los apelantes. El desistimiento ocurrió sin perjuicio y sin especial imposición de costas, gastos ni honorarios de abogados.

La determinación fue traída ante la consideración de este foro apelativo por el Fideicomiso, quien no estuvo de acuerdo con la misma.[25] Ante ello, el 28 de febrero de 2019, un Panel Hermano emitió *Sentencia* confirmando el dictamen recurrido. Es decir, reafirmando que, el desistimiento a favor del Fideicomiso era **sin perjuicio**.

---

[24] Reiteramos que, los apelantes no incluyeron documento alguno en su apéndice sobre este asunto. No obstante, tomamos conocimiento judicial a través de los dictámenes emitidos por este foro apelativo en los casos KLAN201800642 y KLAN202100054.
[25] Dicho recurso fue identificado con el alfanumérico KLAN201800642.

Posteriormente, el pleito volvió a la atención de este Tribunal Apelativo en el recurso KLAN202100054. Mediante este, se precisó que, una instrucción dada por el juez de instancia resultaba errónea, en tanto expresó que, el Fideicomiso no era parte del pleito porque se había desistido de este con perjuicio. En dicha ocasión, esta segunda instancia judicial puntualizó nuevamente que, el desistimiento del Fideicomiso había sido sin perjuicio, y que la *Sentencia* reseñada en el párrafo que antecede era final y firme.

No obstante lo anterior, y de manera inconsistente, el tribunal *a quo* reconoce en su *Sentencia* que carece de jurisdicción sobre la persona jurídica del Fideicomiso[26], mas, lo incluye al desestimar la *Querella* "en cuanto a todas las partes".[27] Tal curso de acción resulta errado.

Si bien este foro devolvió el caso para que se atendieran las controversias pendientes, ello no restituyó la jurisdicción al foro inferior sobre el Fideicomiso. Reiteramos que, el asunto advino final y firme tras el dictamen emitido por este foro el 28 de febrero de 2019. De modo que, el tribunal primario carecía de jurisdicción para resolver cualquier asunto sobre la persona jurídica del Fideicomiso. Consecuentemente, la *Sentencia* recurrida no surte ningún efecto jurídico para con este. Así pues, razonamos que, el primer error señalado fue cometido.

Por estar intrínsecamente relacionados entre sí, discutiremos los errores segundo y tercero en conjunto.

En esencia, los apelantes insisten en que, el Tribunal de Primera Instancia actuó movido por pasión, perjuicio y parcialidad. Precisan que, el foro *a quo* tergiversó los testimonios de los apelantes y cuestionó su credibilidad, sin que se hubiese presentado prueba que refutara sus testimonios.

---

[26] Véase, apéndice del recurso de apelación, pág. 19.
[27] *Íd.*

Por otro lado, sostienen que, el Fideicomiso era un mero administración de la pensión, y que cualquier controversia entre este y el Colegio, en torno al incumplimiento de los acuerdos, constituye un asunto estrictamente entre dichas partes. Así pues, aducen que, independientemente de la causa de acción que pueda tener el Colegio contra el Fideicomiso, el Colegio es quien le adeuda el pago de sus pensiones.

Para atender lo anterior, razonamos pertinente y sumamente persuasivos los comentarios de Tribunal Supremo de Puerto Rico en la *Sentencia* emitida el 18 de julio de 2017, en el caso de *Acevedo Feliciano et. al. v. Iglesia Católica et. al.*[28]

En dicho caso, un grupo de maestros de varios colegios católicos presentaron una demanda contra la Iglesia Católica, luego de que se les notificara sobre la terminación del Plan de Pensiones y la eliminación de sus beneficios de retiro. Tras múltiples incidencias procesales, el caso llegó hasta el Tribunal Supremo en donde, entre otros asuntos, este resolvió que, existían varias disposiciones del Plan de Pensiones que versaban sobre la responsabilidad de los patronos participantes para con los beneficiarios. En específico, el Tribunal Supremo de Puerto Rico señaló lo siguiente:

> A la vez, e independientemente de la legalidad de la terminación del plan, del Plan de Pensiones surgen varias cláusulas que versan sobre la responsabilidad de los patronos participantes para con los beneficiarios, a saber: 1) el Artículo 2 (B)[29], donde los patronos garantizan su contribución de los fondos necesarios para la operación del plan, 2) los Artículos 4 (B)[30] y 8

---

[28] 200 DPR 458 (2018).

[29] Nota al calce en el original: "B. Los patronos participantes garantizan y declaran que para la operación y administración del plan, han autorizado y convenido en contribuir los fondos necesarios por medio del fiduciario y que dichos fondos formarán parte de la propiedad del fideicomiso que será mantenido y administrado por el fiduciario para el beneficio de los empleados y sus beneficiarios; esto bajo los términos del plan según establecido". *Plan de Pensiones de las Escuelas Católicas de la Arquidiócesis de San Juan*, pág. 5.

[30] Nota al calce en el original: "B. Estos beneficios son independientes de, y en adición a, los beneficios de Seguro Social y serán pagados por vida, con una garantía de por lo menos 60 meses. *Id.*, en la pág. 6.

(B.1)[31] donde se enfatiza una garantía de pago de por lo menos sesenta (60) meses, 3) el Artículo 7(E)[32], donde se establece que los patronos que terminen su participación en el plan son responsables de amortizar el pasivo acumulado no financiado, y 4) el Artículo 15 (B)[33], donde se enfatiza que el patrono que se retira del Plan es responsable de los beneficios adquiridos de sus empleados mientras participó. Todo esto requiere examinar la responsabilidad que incurrieron los patronos al pactar el Plan de Pensiones, y si ésta se extiende más allá de la figura del fideicomiso que establecieron.

Al así expresarse, el Alto Foro sugirió que existía una obligación de los patronos participantes para cumplir con la responsabilidad de pagar las pensiones de los empleados cuando el Fideicomiso no pudiese. Ahora bien, el Tribunal Supremo también propone, a través de su dictamen, que resulta imperativo determinar si, independientemente de las disposiciones del Plan, la responsabilidad del Colegio se extendió más allá de la figura del Fideicomiso. A dicha interrogante, respondemos en la afirmativa. Veamos.

De entrada, señalamos que, tal y como resuelve el foro primario, del expediente ante nuestra consideración no surge ningún documento que evidencie que el Colegio se haya obligado a pagar directamente la pensión a sus empleados. Tampoco surge evidencia que demuestre que los apelantes hayan pactado directamente contrato alguno con el Fideicomiso en relación al Plan de Pensiones.

Ahora bien, tras una lectura detenida de la totalidad del expediente, con especial atención a la transcripción de la prueba

---

[31] Nota al calce en el original: "B.1 Forma Normal de Pago: Anualidad de por vida con pagos de 60 meses garantizados..." *Id.*, en la pág. 8.

[32] Nota al calce en el original: "E. Un patrono participante que termine su participación en el plan, continuará siendo responsable por la amortización del pasivo acumulado no financiado por servicios, desde la fecha en la cual empezó su status como patrono participante; y el comité solicitará que este patrono participante aporte anualmente la cantidad necesaria hasta tanto haya pagado, su participación del pasivo acumulado." *Id.*

[33] Nota al calce en el original: "... Aun en los casos excepcionales donde se autorice una baja definitiva a un patrono, éste será responsable de los beneficios adquiridos (past liability) de sus empleados mientras estuvo participando del plan." *Id.* en la pág. 16.

oral, queda en evidencia la existencia de un acuerdo verbal entre el Colegio y los apelantes, con respecto al beneficio de la pensión.

El señor Ponce Abreu, quien fungió como Director Asociado del Colegio desde el 1974 hasta el 2010[34], atestiguó que, él y la Directora citaron a una reunión a los maestros.[35] Expresó que, en la reunión, se les informó a los maestros que no se les daría un aumento.[36] No obstante, le indicaron que, "surgía este incentivo de tan pronto nos retiráramos tener a cabo, o recibir, una pensión."[37] Adicionalmente, el señor Ponce Abreu expresó que, la decisión de ofrecer dicho beneficio fue tomada en conjunto por él y la Directora.[38]

Por otro lado, la señora Wilma López González afianzó en su testimonio que, los empleados del Colegio fueron convocados a una reunión allá para el año 1979.[39] Manifestó que, el Colegio les ofreció un beneficio de pensión para cuando fuesen mayores.[40] Añadió que, la Directora le ofreció la pensión y el Colegio se obligó a pagarle la misma.[41] De otro lado, manifestó que, el Colegio les indicó que la pensión sería "de por vida", y nunca se le explicó que ello podría verse interrumpido por cualquier razón.[42]

Lo antes reseñado, refleja sin más que existió un acuerdo entre los maestros y el Colegio con respecto a la pensión. Dicho acuerdo, generó una expectativa razonable en los apelantes, en cuanto a que el Colegio les pagaría una pensión vitalicia una vez se jubilaran. La extensión de dicho beneficio, además, fungió como incentivo para que los apelantes continuaran laborando en el Colegio. Esto pues, conforme surge de la transcripción de la prueba

---

[34] Véase, Transcripción de la Prueba Oral, pág. 204, líneas 20-25; pág. 205, línea 1.
[35] *Íd.*, pág. 206, líneas 20-25, pág. 207, líneas 1-5.
[36] *Íd.*
[37] *Íd.*
[38] Transcripción de la Prueba Oral, pág. 208, líneas 22-25; pág. 209, líneas 1-2.
[39] *Íd.*, pág. 262, líneas 22-23.
[40] *Íd.*, líneas 15-21.
[41] *Íd.*, pág. 255, líneas 15-24.
[42] *Íd.*, pág. 256, líneas 11-17.

oral, el ofrecimiento del Colegio ocurrió en un contexto donde los apelantes percibían un ingreso por debajo del salario que recibían los maestros del Departamento de Educación.[43]

Según es sabido, los acuerdos verbales son igualmente válidos que los escritos.[44] Asimismo, resulta harto conocido que, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley".[45]

Insistimos en que, los testimonios de los apelantes demuestran la existencia de un acuerdo verbal entre las partes. El Colegio ofreció el beneficio de una pensión vitalicia para con sus empleados, y estos, de buena fe, confiaron en que así sería.[46] Si bien la acción de pagar fue delegada al Fideicomiso, era el Colegio el responsable de la obligación en cuestión. Terminado el Fideicomiso, la responsabilidad de emitir los pagos se retornó al Colegio.

**IV**

De conformidad a todo lo anterior, concluimos que, el Colegio viene obligado a continuar con el pago de las pensiones a los apelantes. Consecuentemente se revoca el dictamen apelado y se condena al Colegio a satisfacer el beneficio de la pensión a los apelantes hasta alcanzar el periodo de sesenta (60) meses garantizados por la escritura constituyente del Fideicomiso.

Notifíquese.

---

[43] *Íd.*, pág. 210, líneas 16-24; pág. 252, líneas 9-14; pág. 254, líneas 16-25; pág. 255, líneas 1-14.

[44] *Méndez v. Morales*, supra; *Vila & Hnos., Inc. v. Owens Ill. De P.R.*, supra.

[45] Art. 1210 del Código Civil, 31 LPRA § 3375; *Aponte Valentín v. Pfizer Pharm.*, supra; *Burgos López et al. v. Condado Plaza*, supra, pág. 8.

[46] Como corolario, añadimos que, coincidimos con los comentarios del Tribunal Supremo en el caso de *Acevedo Feliciano et. al. v. Iglesia Católica et. al.*, supra, en cuanto a que, poco importa quien contribuya directamente a un plan de pensiones; "si el patrono lo ofrece como uno de los beneficios laborales, viene obligado a honrarlo de acuerdo a las condiciones que se pacten entre las partes."

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones